IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Hector Garcia,                                                    Case No. 3:07CV221

       Plaintiff,

   v.                                                          ORDER

 Daimler Chrysler Corp., et. al.,

       Defendants.

     This is an employment discrimination case. Plaintiff Hector Garcia claims that defendant Daimler Chrysler Corp. [Chrysler] – a Michigan based automobile manufacturer and retailer – illegally retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 4112, for reporting a co-worker's alleged sexually inappropriate comments. Garcia also alleges that his local union, Local 12 of the United Auto Workers [UAW], and its chairman, Dan Henneman, illegally retaliated against him. Jurisdiction exists under 28 U.S.C. § 1331.

1

Pending are Chrysler's and UAW's motions for summary judgment.[1] [Docs. 25, 26]. For the reasons stated below, defendants' motion shall be granted.

## Background

Chrysler has employed Garcia as an hourly employee since 1983. In 1986, Chrysler transferred Garcia from its Kenosha, Wisconsin, plaint – where Chrysler had first hired him – to its Toledo, Ohio, plant where he currently works. Garcia, a "floater" – an employee who rotates between multiple positions at a plant, has worked in several departments. As a floater, Garcia cannot use his company seniority status to displace members returning to their "home departments" even if he has more seniority.

An employee's home department is the department where he or she has seniority under the collective bargaining agreement. Chrysler frequently transfers employees when it reduces its workforce or permanent bid employees – employees who Chrysler assigns to a specific department – return from sick leaves or vacations to their home departments.

As a result of a prior injury, Garcia's work restrictions included a "no repetitive gripping restriction" on his right hand. [Doc. 24, Ex. 1]. Accordingly, Chrysler should only have placed Garcia in positions which conformed with his medical restriction. Nonetheless, Chrysler frequently transferred Garcia to departments which required work he could not perform. Chrysler, however, frequently reassigned Garcia after it transferred him.[2]

---

[1]

UAW filed its motion to dismiss on behalf of itself and Henneman, its chairman.

[2]

For example, on February 11, 2000, Chrysler transferred Garcia from department 9130 to department 3414 because the former could not accommodate his medical restrictions. Chrysler transferred Garcia back to department 9130 on February 15, 2000. On March 23, 2001, Chrysler sent Garcia to labor relations because department 9130 still could not accommodate his medical

2

Garcia alleges that on August 19, 2004, he overheard Mark Epley, a union representative, tell Connie Ramirez in the break room that the union would pay her expenses for a "Hispanic Conference" in Chicago if she "spen[t] the night with him in a room and another night with Dan Henneman." [Doc. 29].

Garcia informed Bill McCollough, also a Chrysler employee and union representative, the same day about the incident. Garcia alleges that McCollough told him that he would tell Gary Peterson, also a Chrysler employee and UAW's Vice Chairman, about the incident.

McCollough then confronted Ramirez about the incident. Ramirez neither verbally confirmed nor denied the event, but merely "put her head down." [Doc. 29]. During a second meeting between McCollough and Ramirez, she stated that "it would not matter [if she complained], they were all pigs." [*Id.*]. McCollough informed Garcia that if Ramirez did not take action he could not act either.

Garcia alleges that he subsequently informed Bruce Baumhower, UAW President, about the incident. Garcia alleges that Baumhower told Garcia that he believed him. Baumhower then contacted Epley, who denied the incident. Baumhower shortly thereafter informed Garcia of Epley's denial.

Garcia also alleges that he contacted UAW's International Representative, Dan Twiss, about the incident. Twist denies that Garcia ever contacted him.

Garcia alleges that he then contacted Fred Muir, his union steward. Muir suggested that Garcia mail letters to UAW's senior representatives and Chrysler's senior managers detailing Epley's actions. Muir provided Garcia with addresses for such persons.

---

restrictions.

In November, 2004, Garcia sent Thomas Maxon, Senior Manager of Human Resources at Chrysler's Toledo North Assembly Plant, a letter stating:

> I would like to file charges against union brother Mark Epley for using his job as a tool for sexual harassment. Mark Epley needs to be removed from his union job and disciplined. On August 19, 2004, I went on my break because I knew Connie Ramirez was working in the committee room. She was at the coffee pot and did not see me walk in. Mark Epley was sitting in his office with the door open. I heard Mark Epley discussing a trip to Chicago for a Hispanic Conference with her. He said I'll pay for your room for 3 days, and I'll pay your expenses, but he said you have to spend one night in a room with me because I'm sending you to Chicago.

[Doc. 26, Ex. 10].

This was the first time Garcia informed Chrysler's management about the alleged incident.

Several union representatives reported to Maxon that Garcia had also mailed them copies of the same letter at their home addresses. Many expressed concern that their addresses were publicly available.

Chrysler and UAW keep the addresses of senior personnel and union representatives confidential. Company policy prohibits public disclosure of such information.

In the past, Chrysler has punished employees who misuse such information. In 2000, a Jeep employee used such information to obtain credit cards in the names of other employees. Chrysler fired the employee.

Several employees, after receiving Garcia's letter, contacted Henneman regarding his allegations and their home addresses' public availability. Henneman then contacted Mark Garrett, Ramirez's committeeman, seeking to initiate an investigation.

On November 4, 2004, Twiss, Ramirez, Garrett, and UAW Civil Rights Chairman Raul Ledesma met to discuss Garcia's letter. Ramirez again denied Garcia's allegations and called Garcia

4

a liar. She admitted that she had discussed with Epley a trip to Chicago, but denied that Epley had sexually harassed her.

On November 5, Morrisey and Henneman confronted Garcia regarding his allegations. Garcia alleges that Henneman began yelling at Garcia for reporting the incident, repeatedly calling him a "fucking liar." [Doc. 30]. In addition, Garcia alleges that Henneman repeatedly threatened his job and told him that he would not attend any more Hispanic conferences. Garcia alleges that Henneman repeatedly used the same and other obscenities. Robert Morrisey saw Henneman yell at Garcia.

UAW did not send Garcia or any other UAW members to any non-UAW conferences after that date. UAW alleges that it can no longer afford to send employees to such conferences.

Meanwhile, Maxon, Jean Hathaway, a Chrysler labor relations supervisor, and Henneman also began investigating Garcia's allegations. On November 5, 2004, Ramirez denied that the incident occurred during an interview with them.

Later that day, the group met with Garcia and Muir.

After Garcia recounted the incident, the group asked Garcia about how he obtained Chrysler senior employees' and the local union representatives' addresses. Garcia alleges that Henneman threatened that if Garcia did not inform them of the source, Chrysler would fire him. Garcia provided conflicting answers: 1) he found them on the internet; 2) he drove to their houses; and 3) his wife obtained them. Garcia eventually admitted that Muir gave him the addresses, but refused to discuss the matter at length. Garcia alleges that Maxon and Hathaway subsequently told him that if he did not tell the truth he would lose his job and would not return to work.

5

When the committee asked Muir how he obtained the addresses, he responded: "I plead the Fifth." [Doc. 26]. Despite Maxon's prodding, Muir responded the same way four times. At some point during the meeting, Muir admitted he had provided Garcia with the addresses.

Chrysler subsequently suspended Garcia indefinitely without pay pending an investigation into how he obtained the addresses. Hathaway escorted Garcia out of the building. Garcia alleges that "as she walked [him] out of the plant[,] she continued her verbal tirade against him threatening that he would never see the inside of the plant again. She asked him what he was going to tell his wife and family when he lost his job." [Doc. 29]. After Garcia complained that Chrysler was illegally retaliating against him, Hathway allegedly responded: "you are never coming back Hector because you are a liar." [*Id*.].

While Hathaway did not investigate the matter further, Maxon spoke with union officials regarding their concern about the addresses' availability and conducted a second interview, on November 9, with Garcia about the addresses' source.

Garcia subsequently filed a grievance with UAW asking that Chrysler reinstate him with back pay for the days he missed. On November 10, Chrysler reinstated Garcia. Chrysler also paid Garcia for the three days he had not worked.

Garcia filed discrimination charges with the EEOC on January 31, 2005, alleging that the UAW and Chrysler illegally retaliated against him for reporting the incident between Epley and Ramierez.

On February 14, Chrysler Area Manager Brian Tringali transferred Garcia from the material handling department in which he had been working back to his home department in another area of the plant. Tringali explained that Chrysler transferred Garcia because the material handling

6

department was overstaffed. Tringali was not involved in the incident's investigation or Garcia's EEOC complaint.

Ledesma explained in his deposition that labor relations and Chrysler jointly make transfer decisions. He also testified that based on his "impression" and as he could "not think of any other reason," Chrysler transferred Garcia because of his report.

Garcia alleges that when he arrived at his home department, the manager was unaware that Chrysler had transferred him and did not have a position for him. Accordingly, he sent Garcia home for several days. On his return, Chrysler placed Garcia in a more physically demanding job which violated his medical restrictions. After Garcia challenged his placement, Chrysler transferred him back to his position in the stock department as a "hi-lo driver".

The EEOC, after considering Garcia's allegations, issued a determination letter stating:

> After a thorough review of the record, there is sufficient evidence to indicate Charging Party [Hector Garcia] was suspended in retaliation for participating in a protected activity. The evidence also reveals Charging Party was assigned harsher duties and harassed after his complaint. Based on the foregoing, I have determined that the available evidence establishes a violation of the statute.

[Doc. 29, Ex. 9].

Garcia then filed this suit seeking $100,000,000 in damages.

## Standard of Review

A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial responsibility of informing the district court of its motion's basis, and identifying the record's portions that demonstrate the absence of a genuine issue of material fact.

*Id.* at 323. The nonmoving party "must [then] set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. The nonmovant must show that there is more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Fed R. Civ. P 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of concrete evidentiary material in its position's support. *Celotex*, *supra,* 477 U.S. at 324.

In deciding the motion for summary judgment, the court will believe the non-moving party's evidence as true, it will resolve all doubts against the non-moving party, it will construe all evidence in the light most favorable to the non-moving party, and it will draw all inferences in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). A court shall render summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material facts and that the moving party is entitled to summary judgment as a matter of law.

### Discussion

Garcia alleges that Chrysler, the UAW, and Henneman illegally retaliated against him because he reported Epley's comments to Ramierez.

To prove a prima facie case of Title VII retaliation, Garcia must show that:

1) [he] engaged in activity protected by Title VII; 2) this exercise of protected rights was known to defendant; 3) defendant thereafter took adverse employment action

8

against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by the supervisor; and 4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

If a plaintiff establishes a prima facie case, the burden shifts to the defendants to "'articulate some legitimate, nondiscriminatory reason' for [their] actions." *Id.* at 793 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Plaintiff must then demonstrate that "'the proffered reason was not the true reason for the employment discrimination,'" but, rather, a pretext for discrimination. *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

### A. Garcia's Claim Against Chrysler

Chrysler and Garcia agree that Garcia engaged in protected activity. The parties dispute whether Chrysler was aware of such activity, took adverse employment action or subjected Garcia to severe and pervasive harassment and whether any such action was connected to his protected activity.

Garcia alleges Chrysler took three adverse employment actions against him when it: 1) suspended him for three days; 2) transferred him back to his home department and assigned him a job which violated his medical restrictions; and 3) prevented him from attending later Hispanic conferences.

Additionally, Garcia alleges that Hathaway and Henneman illegally harassed him.

### 1. Knowledge

Chrysler argues that Brian Tringali, who decided to transfer Garcia, was not aware of his report about Epley and, therefore, could not have had a retaliatory motive when he transferred Garcia. Garcia argues that while Tringali may not have been aware of the report, Maxon, Hathaway

9

and several other Chrysler employees to whom Garcia sent letters were aware of his report and likely influenced Tringali's decision.

The Sixth Circuit has refused to impute knowledge from one supervisor to another unless plaintiff presents some evidence: 1) of prior interactions between the knowing official and the acting official; 2) that the knowing official in some capacity contributed to the decision to punish the employee; or 3) that the acting official had some knowledge of the conduct allegedly giving rise to the retaliation. *See Mulhall v.  Garcia*, 287 F.3d 553-54 (6th Cir. 2002) (finding that where two supervisors knew of plaintiff's conduct, but the acting supervisor was not aware of plaintiff's conduct and plaintiff presented no other evidence of the latter's knowledge, he did not establish a prima facie case).

Garcia seeks to impute knowledge of his report to Tringali solely on the basis that Maxon and Hathaway were aware of it. His unsupported supposition that Maxon or Hathaway told Tringali about the report is not a substitute for evidence that Tringali knew, or, at least, had reason to know, about Garcia's report about Epley. Thus, Garcia cannot prevail on his claim of retaliatory transfer.

Regardless, as discussed below, even if I were to find that Tringali had knowledge of Garcia's report, he cannot prove that a causal connection between his report and the transfer existed.

### 2. Adverse Employment Action/Severe and Pervasive Harassment

Garcia alleges that Chrysler took adverse employment actions against him and was responsible for severe and pervasive harassment he suffered after his report.

### a. Adverse Employment Action

10

Garcia claims to have suffered three legally cognizable adverse employment actions: the three day suspension; his transfer to his home department and the ensuing work assignment and denial of opportunities to attend Hispanic conferences.

Because, as Garcia acknowledges, the UAW alone decides whether to sends its members to conferences, Chrysler cannot be held accountable for the decision not to send Garcia – or any other employee– to a union conference.

Chrysler does not dispute that Garcia's suspension constituted an adverse employment action.

The only  remaining question is thus whether Garcia's transfer constituted an adverse employment action.

To constitute a cognizable adverse employment action:

> a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (quoting *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)).

A "mere inconvenience or an alteration of job responsibilities" or a "bruised ego" does not constitute an adverse employment action. *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885-87 (6th Cir. 1996) (citing *Crady, supra,* 993 F.2d at 136, and *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994)).

Courts relying on the *Crady* factors have differed as to whether an employer's decision to transfer an employee to a position in contravention of his or her medical restrictions constitutes an

11

adverse employment action. In *Farra v. GMC*, 163 F.Supp. 2d 894, 913 (N.D. Ill. 2001), the court found that where an employer transferred the plaintiff to a position which violated his medical restrictions, but reassigned him after he complained, there was no adverse employment action. In *Baker v. Runyon*, 2000 WL 767846, *7 (7th Cir. 2000) (unpublished disposition), however, the Seventh Circuit held that where an employer repeatedly ignored plaintiff's requests to accommodate her medical needs, she suffered an adverse employment action.

Neither party presents any evidence as to how quickly or how often Garcia complained about the transfer or how promptly Chrysler responded to his complaints. Because I must draw every inference in Garcia's favor, I conclude, on the basis of the record before me, that Garcia's transfer constituted an adverse employment action.

### b. Severe and Pervasive Harassment

Garcia also alleges that Hathaway's comments as she escorted Garcia out of the building after their meeting and Henneman's comments to him on the same day constituted severe and pervasive harassment.

The Supreme Court, in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67-69 (2006), held that plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context. A materially adverse employment action in the retaliation context consists of any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quotation marks omitted).

Under this more liberal definition, actions not materially adverse for purposes of an anti-discrimination claim may be deemed as such in the retaliation context. *See, e.g., id.* at 68

12

(noting that a supervisor's failure to invite an employee to lunch could, under certain circumstances, amount to materially adverse retaliation action); *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 432 (6th Cir. 2007) (remanding for reconsideration in light of *Burlington Northern* whether assigning plaintiff a poor performance evaluation score constituted an adverse employment action for the purpose of setting forth a retaliation claim).

The Sixth Circuit, however, has found that even under the new more lenient standard a single exchange of harsh words does not constitute severe and pervasive harassment. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) ("The initial confrontation between Michael and Henry, in which harsh words were exchanged, does not amount to a materially adverse action."); *see also Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (holding that a "contentious oral confrontation" involving "stern words" did not amount to harassment, let alone to a materially adverse employment action).

Under this standard, neither Henneman's comments while he was seeking to learn how Garcia came to know his co-workers' home addresses nor Hathaway's tirade as she led Garcia out of the plant constituted, either singly or together, actionable harassment.

### 2. Causal Connection

Garcia cannot, in any event, prove that his report about Epley caused either his suspension, transfer or Hathaway's comments.

### a. Chrysler's Suspension of Garcia

Chrysler states that Garcia's failure to be sufficiently forthcoming about the source of Chrysler senior employees' and union representatives' addresses was the basis for his suspension. As noted above, Garcia gave multiple contradictory answers before finally admitting that Muir gave

13

him the addresses. Company policy prohibits the public disclosure of home addresses. When made available, others have misused such information and Chrysler has disciplined them. Accordingly, Chrysler had the right to suspend Garcia pending completion of an investigation as to how he obtained the addresses.

Garcia unsuccessfully argues that this reason was merely pretextual.

First, Garcia argues that Maxon admitted that Chrysler did not suspend him for violating any work rule or policy. While Maxon stated that Garcia's suspension was not in response to a work policy violation, he also asserted that Chrysler suspended Garcia so that it could further investigate how Garcia obtained the addresses – i.e., to determine if Garcia had violated company policy. The difference between the two is minimal. Underlying both explanations is the common thread that Chrysler's suspension of Garcia was related to how he obtained the addresses and not his report.

Second, Garcia cites to *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008), in which the employer fired the plaintiff immediately after he arrived at work on the same day that the employer had received notice of his EEOC charge. The court stated, that "in those limited number of cases – like the one at bar – where an employer fires an employee immediately after learning of a protected activity, [I] can infer a causal connection between the two actions." *Id.* at 526.

This case is distinguishable from *Mickey*. Rather than immediately terminating Garcia, Maxon, began an investigation. Maxon first interviewed Ramirez, who denied that the incident occurred.

The committee then interviewed Garcia. Garcia, in contrast with the plaintiff in *Mickey*, provided Chrysler a separate legitimate reason to suspend him by untruthfully answering questions

14

concerning the violation of company policy. After finding his answers inconclusive and, therefore needing to investigate the matter further, Chrysler suspended him. Considering these differences, I find this is not one of the limited cases to which the court referred in *Mickey*.

Third, Garcia argues that the actions' close proximity and Hathaway's statements to Garcia as he left the plant prove a casual connection. Hathaway, as she walked Garcia out of the plant, allegedly threatened Garcia that if he did not tell the truth, Chrysler would fire him. This statement referred to Garcia's failure to answer truthfully Maxon's and her questions immediately before she escorted him from the plant. Garcia presents no evidence that her statement alluded even indirectly or otherwise was related to his report about Epley's comment to Ramierez.

Fourth, Garcia argues that Chrysler did not need to investigate further because Muir previously informed the committee that he provided Garcia with the addresses. While Muir previously admitted that he provided Garcia with the addresses, when initially asked about the matter, he refused to answer, except to say he "plead[ed] the fifth."

Garcia, furthermore, provided multiple contradictory answers before confirming that Muir provided the addresses.

In view of all the circumstances, Chrysler's decision to investigate further was reasonable. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807-808 (6th Cir. 1998) ("the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.").

Finally, Garcia argues that the committee did not further investigate the addresses' source after Chrysler suspended him. While Hathaway did not investigate the matter further, Maxon spoke

15

with union officials regarding the address' source and conducted a second interview with Garcia about the matter.

### b. Chrysler's Transfer of Garcia

Nor can Garcia prove that his transfer from the stock department back to his home department was causally connected to his report. Chrysler states that overstaffing in the stock department motivated the move. Garcia has presented no evidence to show that the stock department was not overstaffed.

Garcia admits, moreover, that, as a floater, he had no seniority rights within the Material Handling Department; thus, he could not leverage time spent in that department against those whom the company had hired more recently. The record also shows that Chrysler frequently transferred Garcia between departments, often in contravention of his medical restrictions. The transfer about which he complains was not, therefore, an isolated and otherwise inexplicable event.

In response, Garcia presents four pieces of evidence.

First, he points to Raul Ledesma's testimony that Chrysler transferred Garcia as a result of his report. Ledesma admits, however, that he based his conclusion on his "impression" of the events and because he could not "think of any other reason."

Rule 56(e) requires exclusion of these opinions from consideration. Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits *shall be made on personal knowledge*, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). Neither impressions without a factual basis nor the lack of alternative explanation constitutes affirmative evidence of cause for Garcia's transfer.

16

Second, Garcia relies on the EEOC's determination letter setting forth a finding that Chrysler transferred Garcia in retaliation for his report. The Sixth Circuit has found that such notice is "widely considered to be presumptively inadmissible 'because it suggests that preliminarily there is reason to believe that a violation has taken place' and therefore results in unfair prejudice to defendant." *Williams v. Nashville Network*, 132 F.3d 1123, 1129 (6th Cir. 1997) (citing *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1095 (5th Cir. 1994) (citation omitted)).

Third, Garcia presents Bill McCollough's testimony that employment decisions are not always based on seniority. That Chrysler does not always make such decisions on the basis of seniority does not mean that Chrysler did not make this decision on the basis of seniority. Had Garcia presented significant evidence that something other than seniority at least in part motivated Chrysler's decision, this argument might have been more significant.

Finally, Garcia argues that the temporal proximity of the transfer combined with other pieces of evidence suffice to prove a causal connection between his transfer and his complaint about Epley. As discussed above, the other evidence Garcia cites is not probative of an intent on Chrysler's part to retaliate.

The transfer occurred, moreover, more than three months after Garcia reported Epley's statements. The delay between Garcia's report about Epley and the company's alleged reaction neutralizes any inference of retaliatory animus. *See Shuman v. GMC*, 1990 WL 127550, *1 (6th Cir. 1990) (Unpublished disposition) (noting that in most cases in which temporal proximity creates an inference of retaliation the time period between report and employer action was two months or less).

### c. Chrysler's Alleged Retaliatory Harassment

17

Garcia also argues that Chrysler illegally harassed him in retaliation for his report. As previously discussed, Garcia presents no evidence that his report, as opposed to his failure to answer the group's questions about his source for the home addresses of other employees and union officials, caused Hathaway's comments.

## B. Garcia's Claims Against the UAW

The UAW and Garcia dispute whether Garcia engaged in protected activity, the UAW took adverse employment action against or severely and pervasively harassed Garcia, and such actions were causally connected to the protected activity. The parties agree that the UAW was aware of Garcia's report.

Garcia alleges that the UAW illegally retaliated in four ways by: 1) failing to prevent, and rather, encouraging Chrysler's suspension of him; 2) concurring in his transfer; 3) through Henneman, its local chairman, harassing him on the plant floor; and 4) failing to send him to subsequent Hispanic conferences.

### 1. Protected Activity

The UAW argues that Garcia, by mailing letters to several Chrysler managers and UAW senior representatives, exceeded the scope of protection Title VII provides to employees who report sexual harassment.

The union relies on the First Circuit's decision in *Hochstadt v. Worcester Foundation,* 545 F.2d 222, 233 (1st. Cir. 1976). In that case the court found that where an employee told other employees that the employer was in danger of losing funding and encouraged her supervisor to take sides in an intra-office debate, her conduct exceeded Title VII's scope of protection. The Sixth Circuit, likewise, has explained that where an employee directly criticizes his immediate supervisor

18

publicly or arouses intense animosity among co-workers Title VII may not protect his activity. *Hickman v. Valley Local School Dist. Bd. of Education*, 619 F.2d 606, 609 (6th Cir. 1980).

Garcia's conduct was not, however, extreme enough to eliminate protection. Epley was not Garcia's immediate supervisor. Likewise, while some union representatives expressed concern about public availability of their addresses, Chrysler presents no evidence that Garcia's conduct disrupted or impeded the operation of the plant or department. *See id.* ("To allow any rancorous feelings engendered in this manner to justify a dismissal would decimate constitutional protections.").

### 2. Sufficiently Adverse or Severe and Causally Connected

The UAW also argues that its actions were neither sufficiently severe or causally connected to Garcia's report.

The UAW posits that Garcia cannot seek damages from it for Chrysler's suspension of him because it appealed the suspension on his behalf, got him reinstated and recouped the lost earnings for the three days of work he missed. Garcia argues that *Virts v. Consolidated Freightways*, 285 F.3d 508, 522 (6th Cir. 2002), which the UAW cites in support, was a retaliatory discharge claim, and does not apply to Garcia's retaliatory harassment claim.

*Virts* is not as narrow as Garcia asserts.  The Sixth Circuit has explained:

in the related context of employment-based retaliation claims, we have required that a plaintiff identify a "materially adverse" effect upon the terms and conditions of his or her employment. We have held that this standard is not satisfied by an interim decision to deny tenure, or even an outright discharge, which is overturned in a subsequent grievance process, and which produces no "final or lasting" harm, the temporary loss of a position; a short-term suspension with pay; or allegedly unjustified disciplinary measures, such as "counseling memoranda," that have no material effect upon the terms and conditions of the plaintiff's employment. One of our observations in Dobbs-Weinstein applies with full force here -- that, if we were to accord "adverse" status to interim decisions that are subject to further internal review, the result "would be to encourage litigation before the [defendant] has an

19

opportunity to correct through internal grievance procedures any wrong it may have committed.

*Brown v. Crowley*, 312 F.3d 782, 802 (6th Cir. 2003) (citations omitted).

Garcia cites to the Supreme Court's decision in *Burlington Northern & Santa Fe Ry.*, *supra*, 548 U.S. at 72, holding that an employee was adversely affected where his employer suspended him indefinitely and reinstated him after thirty-seven days with pay.

I find *Burlington Northern* distinguishable from this case. In reaching its decision, the Court emphasized that:

> White and her family had to live for [thirty-seven] days without income. They did not know during that time whether or when White could return to work. Many reasonable employees would find a month without a paycheck to be a serious hardship. And White described to the jury the physical and emotional hardship that [thirty-seven] days of having no income, no money in fact caused.

*Id.* at 72.

Contrary to his contentions about the putative severity of his suspension [which, in addition to its brevity, the effects of which were remedied by the union's actions], Garcia's claim is governed by *Brown, supra*.

The UAW also points out that Chrysler, not the union, transferred Garcia. It claims, accordingly, that it cannot be held accountable for something which it did not decide.

Garcia in response cites to Ledesma's testimony that "labor and management" make joint decisions about the transfer of employees. UAW argues that Ledesma's statement is speculation as he is not a member of management. It is not clear from the testimony how Ledesma claims to know who makes transfer decisions or whether he could have known the transfer process without being a member of management.

20

The UAW, however, presents no other evidence that it was not involved in transfer decisions beyond its brief's unsupported statements. Drawing all inferences in Garcia's favor, as I must, I find that the Union might have partly been responsible for Garcia's transfer.

As discussed above, however, assuming that the Union played some role in Garcia's transfer, Garcia cannot show that this decision was causally connected to his report as opposed to overstaffing in the stock department.

Finally, UAW correctly points out that Henneman's comments to Garcia, on a single occasion, do not constitute retaliatory harassment. As discussed above, a single incident of verbal threatening is generally insufficient to constitute retaliatory harassment.

### C. Garcia's Claims Against Henneman

Finally, Garcia argues that Henneman is individually liable for illegally retaliating against Garcia. A plaintiff cannot hold an individual liable for illegal retaliation under Title VII. *Wathen v. GE*, 115 F.3d 400, 405 (6th Cir. 1997). Accordingly, I dismiss Garcia's claims against Henneman.

### Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT:

1. Daimler Chrysler Corp.'s motion for summary judgment shall be, and the same hereby is granted; and

2. Local 12, United Automotive Worker's motion for summary judgment on behalf of itself and Dan Henneman shall be, and the same hereby is granted.

So ordered.

s/James G. Carr
James G. Carr

21

Chief Judge